C. B. CHISMORE, Appellant, v. WILLIAM VAN RODEN, Appellee.

**Malicious prosecution:** ATTACHMENT: BURDEN OF PROOF: EVIDENCE.
1   An attachment defendant has the burden not only of proving an allegation of his counterclaim that he had not disposed of any part of his property with intent to defraud his creditors, but also, that plaintiff had no reasonable ground for believing his allegation that defendant had so disposed of the same.
In this action the evidence is held insufficient to support a verdict awarding defendant exemplary damages.

**Appeal:** AMENDED ABSTRACT. An amendment to an abstract filed
2   but not served upon the adverse party will be stricken on motion.

*Appeal from Linn District Court.*—HON. MILO P. SMITH, Judge.

SATURDAY, MAY 6, 1911.

PLAINTIFF brought his action on a promissory note and on account, and sued out a writ of attachment in aid thereof. The defendant admitted the execution of the note and one item of the account, and denied the other items. By way of counterclaim, the defendant claimed damages for wrongful suing out of the attachment. There was a general verdict for the defendant. Plaintiff filed a motion for a new trial, which was denied by the court, and he has appealed. *Reversed.*

*J. H. Preston,* for appellant.

*Barnes & Chamberlain,* for appellee.

EVANS, J.—In September, 1908, the plaintiff sold to the defendant a team of horses for $300, of which $150 was paid down. Two months later the defendant executed a note for $150 for the balance. Later other transactions were had between the parties involving an exchange or sale of other property from plaintiff to defendant. We need not deal with the details of these transactions. By its terms the note became due in the spring of 1909, but was not paid. In the latter part of August, 1909, a sharp dispute arose between plaintiff and defendant over an item claimed by the plaintiff against the defendant and denied by the defendant. This was in relation to the purchase price of a cow which the plaintiff had sold to one Varner; and which Varner sold to the defendant without paying plaintiff for the same. This suit was brought immediately following such disagreement; and that fact and certain language used by plaintiff furnished the basis of the claim

that the attachment was sued out, not only wrongfully, but maliciously. Exemplary damages were claimed by the defendant and allowed by the jury. At the time of the purchase of the team, the defendant was the owner of a large amount of stock which he had in his possession upon a rented farm. On December 1, 1908, he executed a bill of sale to his wife, covering all such stock, which comprised substantially all his property, except growing crops upon the rented farm. This fact came to the knowledge of the plaintiff just prior to the suing out of the writ of attachment. The writ of attachment was levied only upon the property obtained from the plaintiff himself, including, however, the cow sold by plaintiff to Varner. One of the grounds of attachment alleged in the petition was that the defendant had disposed of his property in whole or in part with intent to defraud his creditors. Defendant's counterclaim alleged that none of the alleged grounds of attachment were true, and that the plaintiff had no reasonable ground for believing them to be true.

I. The plaintiff, appellant, assigns several alleged grounds of reversal. The principal point argued, however, is that the verdict was not supported by the evidence, and was the result of passion and prejudice. We will confine our discussion of the case to a consideration of this feature of it. The burden was upon the defendant to prove, not only that he had not disposed of any part of his property with intent to defraud his creditors, but, also, that the plaintiff had no reasonable ground for believing such allegation. The testimony offered by defendant in support of his counterclaim at this point consisted of the evidence of himself and his wife. The material part of defendant's testimony as a witness on this question was as follows: "I hadn't disposed of any of my property shortly before that time. I made a bill of sale to my wife, and I had bought this property with my wife's money. She got it

1. MALICIOUS
PROSECUTION:
attachment:
burden of
proof:
evidence.

from home. She requested me to keep this in her name. I never had any other reason for doing it. At that time I owed $500 to the bank. At the time of this attachment I had forty-five head of cattle, and I think nine head of horses, and about sixty hogs (included in the bill of sale). The farm I was living on was about one hundred and ninety acres. The stock was worth probably $3,000. I had sixty-five acres of corn in the field, and about forty acres of grain out that had not been harvested, and about fifty tons of hay in the barn. I was not about to sell my property to turn it into money at that time. I never offered any of it for sale." Upon cross-examination he testified as follows: "I was farming one hundred and ninety acres of land. I don't know how much money I owed my wife. She had enough to get a start in farming. I know how much it was. It was $3,000. She put it in stock on the farm. She gave me the money, and I bought it. On this attachment the sheriff took three horses, the cow, and bull. Two of the horses were the span I bought of Chismore, and the other was the colt that the mare raised. The two year old bull was the bull in controversy, and the cow was the Varner cow. This was all the property they took. When I told Chismore if he would give me a little time I could get the money, I expected to borrow it of the bank at Coggon. Before this attachment was sued out and on the 1st day of December, 1908, I made a bill of sale to my wife of all the stock on the farm, in consideration of $5,000, no part of which she paid me. It was got up in Cedar Rapids by Mr. Barber. I went down alone to get it up. I went up and told Mr. Barber that I wanted to give my wife a bill of sale and gave him a list of the property. He drew it up, and I acknowledged it, and left it with him to put on record. My wife was at home. This was after I bought the horses and stock, and before the attachment."

After the commencement of the attachment suit, the

wife conveyed back to the defendant the same property by bill of sale for a purported consideration of $6,000. The defendant testified on cross-examination as follows: "Q. So. that there was no real genuine sale that you made— this bill of sale to your wife, was it? A. Well, I guess so. Q. You are certain about that, are you? A. I don't know anything about that. Q. You made the consideration $5,000 when you say that she didn't put in only about $3,000? What did you make it $5,000 for? A. because it was worth it. The stuff was worth it.. Q. Still she didn't pay you anything extra over and above what she put in? A. She didn't pay me anything. Q. She didn't agree to, either, did she? A. I don't know. Q. Don't you know whether she agreed to pay you something over for this stock what she let you have? A. No; she didn't. Q. Then, if the stock was worth $5,000, what did you pay $2,000 over and above that indebtedness to her in the bill of sale for? A. Because, if anything got wrong with me, she would be secure. It wasn't to keep my creditors from getting this property. I put it in at $2,000 more than I owed her to secure her. I put the property at just what it was worth. Q. Then, when you got somebody to secure you on the bond to release the property that was attached, you made her deed it back to you at a consideration of $6,000, didn't you? A. Yes. Q. How do you figure that to secure your wife? A. I don't understand you. Q. How do you figure that would secure your wife? A. I don't know." Redirect examination: "I mean by securing my wife if anything happened to me; that is, if I should die."

The wife of defendant testified as follows: "I let my husband have $3,000 when we started farming about four years ago. That was the first money I let him have. My folks started us. That is what I thought it was worth about that much. We lived at Stanwood before we started farming. They didn't let me have very much money up to

that time. I don't know how much; I should judge about
$400 or $500. I don't know how much money they let
me have the first time, when we started farming. It was
four or five years ago. I couldn't exactly tell. They
didn't let me have the whole amount at one time. We
got it as we bought things. This was at different times.
I don't know how much at a time. I know we bought
things, and I don't remember how much money I got at
a time. I don't just remember. We got some money a
couple of years ago, maybe a thousand or something like
that, from my folks. They live in Olin. They gave me
the money, and I put it in stock. I used some of it, of
course. I didn't particularly keep track of that. I gave
the money to my husband, and he bought stock and put
it on the farm. I didn't give it all to him. We used it
as we needed it. I don't know exactly what money I let
him have. I let him attend to the business. The money
was given by my folks to my husband and myself. I didn't
take any note for this money from him. I didn't know
what he did with it, except I thought he was buying stock.
I bought the clothing and provisions for the family. I
kept some of the money my folks gave me for that purpose.
I don't know how much. I used it all up. I didn't keep
any account of the money, or how much I got, or what
was done with it. I just thought it was worth that much.
That is what we said. We both worked, and whatever we
earned belonged to both of us. I asked him to secure this
money, because I wanted it that way. . . . We talked
this matter over at home. When he wanted to give this
bill of sale, he went down to Cedar Rapids to make it out.
I didn't go with him. Afterwards I conveyed it back to
him. I did that because we got into some trouble and
couldn't do any business any more. We couldn't get any
credit without he had the property. I conveyed it all
back to him. I can't tell how much money I let my hus-
band have. I am a poor hand to keep accounts of things

that way. I didn't keep any account of it in the house. There was no book of account, nor no notes, or anything of that kind. As the money came, I passed it over to him, and let him do as he pleased with it. I don't know how many trips my husband made to Cedar Rapids. He gave me the bill of sale first and the next was made to get the stock back and get a bill of sale back to him."

The foregoing is defendant's proof in support of his allegation that he had not disposed of his property with intent to defraud his creditors, and that plaintiff had no reasonable grounds to believe that he had. It seems to us too clear for argument that this evidence does not sustain defendant's essential allegation. Nor can we see any escape from the legal conclusion that the bill of sale, as explained by defendant and his wife, was a legal fraud upon the defendant's creditors. We see no way to account for the verdict upon this record except that it was the result of passion and prejudice. It ought to have been set aside.

II. The appellee filed an amended abstract, but failed to serve the same upon the appellant or his counsel. Appellant has filed a motion to strike the same, and such motion has been submitted with the case. The contents of such amended abstract are not such as would change our conclusion in this case. The motion, however, must be sustained.

*2. APPEAL: amended abstract.*

On the ground already indicated, the judgment below must be *reversed.*